Filed 1/17/23 P. v. Torrez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JULIO ANGEL TORREZ, JR.,<br><br>Defendant and Appellant. | F082878<br><br>(Super. Ct. No. BF176040A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County. David R. Lampe, Judge.

David W. Beaudreau, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Kari Mueller, Lewis A. Martinez and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Julio Angel Torrez, Jr., appeals from the judgment of his conviction of attempted voluntary manslaughter and related crimes and enhancements arising from an incident where he stabbed his girlfriend, Natalie A., in the chest. He was sentenced to an aggregate prison term of 22 years.

On appeal, appellant contends the judgment must be reversed based on claims of error related to the admission of purported tacit adoptive admissions contained in recorded telephone calls he made to Natalie from jail after his arrest for the incident. During the calls, appellant made a number of statements indicating he knew the calls were being recorded and could not fully express himself because he did not want the prosecution to use his statements against him. In objecting to the admission of the jail calls, defense counsel indicated he had advised appellant not to talk about the case. Relying on these facts, appellant argues the purported adoptive admissions were not admissible under Evidence Code section 1221. Appellant also argues that the prosecution's introduction of the calls violated his due process rights because it invited the jury to draw an adverse inference from appellant's post-*Miranda*[1] silence, in violation of *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*) and its progeny. Appellant also contends his due process rights were violated by the application of the adoptive admissions rule to the jail calls in general, which appellant contends rendered his trial fundamentally unfair.

In a related issue, appellant contends the court erred by denying his request to modify CALCRIM No. 357, the pattern adoptive admissions instruction, to instruct the jury they could consider whether appellant was relying on his Fifth Amendment right to remain silent in determining whether he made any adoptive admissions.

Appellant argues that if we conclude the asserted errors are individually harmless, the prejudicial effect of the errors, considered cumulatively, warrants reversal.

Finally, in the event we do not credit his claims regarding the judgment, appellant contends the matter must be remanded for resentencing in light of recent legislation: Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Assembly Bill 518) and Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567). He also asserts the trial court imposed an unauthorized sentence by imposing a prior serious felony enhancement (Pen. Code,[2]

---

[1]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[2]     All further undesignated statutory references are to the Penal Code.

2.

§ 667, subd. (a)) for each count rather than once as part of the aggregate sentence in violation of *People v. Sasser* (2015) 61 Cal.4th 1 (*Sasser),* and therefore two of the prior serious felony enhancements must be stricken, which respondent concedes.

We affirm appellant's convictions and remand for resentencing in compliance with all applicable laws, with directions to the trial court that only one prior serious felony enhancement may be imposed upon remand.

## FACTUAL AND PROCEDURAL BACKGROUND

**Information**

Appellant was charged by information with attempted murder (§§ 664/187, subd. (a); count 1); assault with a deadly weapon (§ 245, subd. (a)(1); count 2); infliction of corporal injury on an intimate partner resulting in a traumatic condition (§ 273.5, subd. (a); count 3); and willful cruelty to a child (§ 273a, subd. (a); count 4). As to counts 1, 2, and 3, the information alleged appellant inflicted great bodily injury under circumstances involving domestic violence in the commission of a felony (§ 12022.7, subd. (e)). As to every count, the information alleged appellant personally used a deadly or dangerous weapon (§ 12022, subd. (b)(1)). The information further alleged appellant had suffered a strike prior (§§ 667, subds. (c)-(j), 1170.12, subds. (a)-(e)), a prior serious felony (§ 667, subd. (a)); and three prior prison terms (§ 667.5, subd. (b)).

**Facts as Presented at Trial**

*Prosecution Case*

On March 20, 2019, at around 11:00 p.m., Natalie's neighbors heard a male and female arguing in her apartment. One of the neighbors heard Natalie yelling for her children to follow her, and when he looked out his door, he saw Natalie running with her two children down the stairs away from her apartment, appearing to run away from someone. A few minutes later, the neighbor saw a man come down the stairs, look around, take his shirt off, and leave the apartment complex on foot. Later, the neighbor heard Natalie's son screaming and went outside. Natalie was laying in the parking lot

3.

and appeared to be unconscious. Another neighbor called 911; the call was played for the jury, and Natalie's son could be heard on the call saying that "Julio" stabbed his mother. Natalie had endured stab wounds to the center portion of her chest, under her right breast, and her arm.

Law enforcement searched Natalie's apartment. There, they observed the mounting hardware for the window curtains had been pulled down and blood on the hallway wall. They found documents and a California Identification Card with appellant's name. They also found a fixed blade knife located in the kitchen.

The next morning, law enforcement made contact with appellant at the Department of Motor Vehicles. They asked appellant for his identification and name, and appellant displayed aggressive behavior and refused to follow instructions. Officers needed to use force to detain and subdue him. Eventually, appellant provided a false name and date of birth. Appellant was arrested. Photos taken of appellant at the time of his arrest depict cuts on his hands.

Appellant made several[3] telephone calls to Natalie from jail, and recordings of 10 calls were played for the jury. Over the course of the calls, appellant and Natalie discussed the incident. The first mention of the incident was in the first call played for the jury, when appellant asked Natalie why he was brought to jail, to which Natalie responded, "I don't know [appellant]. You don't know what you did or what?" In this call, Natalie went on to make several statements accusing appellant of "almost kill[ing her]," almost "t[aking her] kids' only parent," and "going for the kill." Appellant told Natalie she knew "what happened," but that he did not want to talk about "all of that." Natalie replied that she knew "what happened," that appellant "almost killed" her but that she was not planning on pressing charges or cooperating with the prosecution.

---

**3**      A jail call log was admitted into evidence but was not transmitted to this court as part of the record on appeal; however, the prosecutor stated in his closing argument that the call log indicated appellant made over 80 calls to Natalie while in jail.

4.

A major thread throughout all calls that were played involved appellant pleading with Natalie not to speak with the district attorney and instead to let her family kill him when he got out of custody, at multiple points telling her he "deserve[d]" it. Throughout the calls, Natalie maintained she would not cooperate with the prosecution but also expressed anger at appellant for almost killing her. At one point after Natalie expressed anger towards appellant, appellant responded, "I stopped. Right?"

At several points throughout the calls, appellant expressed that he did what he did because he had feared for his life. At one point after expressing he had been fearful, the following exchange occurred:

"NATALIE []:          But fear from what?

"[APPELLANT]:          By your brother bein' there.

"NATALIE []:          He had to (unintelligible)…

"[APPELLANT]:          By all them – by them people bein' outside, you know?

"NATALIE []:          What people – what people?

"[APPELLANT]:          But – but I don't – I don't want to talk about this, you know what I mean?"

Appellant went on to tell Natalie he would forgive her and hoped she would forgive him as well. Natalie responded by telling appellant she did not do anything to him and was nothing but good to him.

At another point in the calls, appellant told Natalie he did not want her to hate him for "what happened" and again that he would forgive her.

"NATALIE []:          You forgive me for what?

"[APPELLANT]:          I forgive you for…

"NATALIE []:          Yeah that made no sense.

5.

| | |
|---|---|
| "[APPELLANT]: | I felt like my life was in jeopardy and… |
| "NATALIE []: | How? How? |
| "[APPELLANT]: | I don't want to talk about it. |
| "NATALIE []: | You were on drugs. |
| "[APPELLANT]: | Because, you know… |
| "NATALIE []: | You were on drugs. You were laced the f[***] up. |
| "[APPELLANT]: | Hey. |
| "NATALIE []: | Like, how can you say your life was in danger when you were cheating on me with Brandy or whatever the f[***]." |
| "[APPELLANT]: | Hey." |

The parties stipulated to the admission of Natalie's medical records related to her treatment for the injuries she sustained. The parties further stipulated that appellant had been convicted of a domestic violence misdemeanor in 2015 that did not involve Natalie.

### Defense Case

The defense played an additional recording of one of appellant's jail calls to Natalie. On that call, appellant told Natalie he was going to take his case "all the way" and that he wanted to be with her when he got out. Natalie assured appellant she would not do anything "against" appellant. Appellant said he was "angry that I can't explain myself and – and direct you how to." Natalie and appellant discussed him cheating on her. Appellant told Natalie "they're gonna try to make me guilty as – as – as – as they can." They then had the following exchange:

| | |
|---|---|
| "NATALIE []: | But you know you're not guilty. |
| "[APPELLANT]: | No matter what… |
| "NATALIE []: | You know you're not guilty. |

"[APPELLANT]:          …hey, no matter…

"NATALIE []:           You know…

"[APPELLANT]:          …what I tell 'em…

"NATALIE []:           You know that…

"[APPELLANT]:          No matter what the truth is.

"NATALIE []:           You know you're not guilty.  You know that – that…

"[APPELLANT]:          No matter what the truth is.

"NATALIE []:           …that wasn't you – you – you – that wasn't you, like, you know, like – I don't…

"[APPELLANT]:          All I gotta say is I defended myself.  You know what I mean?

"NATALIE []:           Okay then.  Then that – that – that's – you defended yourself.

"[APPELLANT]:          And – and – and – you know what I mean?  You have your brother there.

"NATALIE []:           Okay. You defended yourself.  You know, like…

"[APPELLANT]:          You know what I mean?

"NATALIE []:           Yep."

Appellant asked Natalie if she wanted him to stop talking to her, and she said she did not think she would be able to be around him comfortably anymore, so if he wanted to stop calling her, he should.  Appellant asked Natalie if she wanted him to go to prison, to which she responded she did not, not because of him but because of his mom and that he was someone's son.  She stated she did not wish his mother to suffer.  Appellant then said he was angry and that he wanted "to explain to you what happened.  If you don't believe me, you don't believe me."  Appellant made Natalie promise she would talk to his mother.  The following exchange occurred:

| "[APPELLANT]: | … You're over here tryin' to say – you sound like you're a good and all that. |
|---|---|
| "NATALIE []: | Like, I'm good about what? |
| "[APPELLANT]: | You don't remember what happened? |
| "NATALIE []: | No, I don't. I was drunk. I was drunk. I don't know if I did something to trigger you. I don't know if I made you mad. I don't know. You know? I don't know. I was drunk. But if I did do something to trigger you, like, I apologize. That was never my intention." |

Appellant said he did not want to talk about that because the call was being recorded and that he loved her but she did not believe him. Natalie told appellant she loved him too.

The defense argued appellant acted in self-defense. Defense counsel posited the evidence reasonably supported that Natalie was upset with appellant for cheating on her and attacked him with a knife, as evidenced by the phone calls, as well as the cuts on his hands, and that appellant stabbed Natalie in reasonable self-defense.

**Verdict and Sentence**

The jury acquitted appellant of attempted murder as charged in count 1 and found him guilty of the lesser included offense of attempted voluntary manslaughter (§§ 664/192, subd. (a)). They found him guilty of counts 2 and 3 as charged. They acquitted him of willful cruelty to a child as charged in count 4 and found him guilty of the lesser included offense of misdemeanor child abuse (§ 273a, subd. (b)). As to counts 1, 2, and 3, they found true the allegations that appellant inflicted great bodily injury upon Natalie (§ 12022.7, subd. (e)). As to counts 1 and 3, they found true the allegations that appellant personally used a deadly weapon in the commission of the offenses (§ 12022, subd. (b)(1)).

In a bifurcated court trial, the court and parties agreed section 667.5, subdivision (b) no longer applied to appellant's convictions; accordingly, the court

8.

found the prior prison term allegations unproven. The court found true that appellant had suffered a strike prior and prior serious felony.

The court sentenced appellant to the upper term of five years six months on count 1, doubled to 11 years due to the strike prior, plus five years for the great bodily injury enhancement, plus one year for the deadly weapon enhancement, plus five years for the prior serious felony enhancement. As to count 4, the court imposed 180 days in jail to be served concurrently with the sentence imposed on count 1. The court stayed punishment on counts 2 and 3 pursuant to section 654.[4] Appellant's aggregate sentence was a prison term of 22 years.

## DISCUSSION

**I.    Admission of Tacit Adoptive Admissions Contained in the Jail Calls**

Appellant argues the trial court erred by admitting the purported tacit adoptive admissions contained in the recordings of the jail calls. We conclude any error was harmless beyond a reasonable doubt.

### A.    *Relevant Background*

As referenced in the above summaries of the calls, appellant made several statements indicating he did not want to talk about certain topics and that he could not fully express himself. At a few points, appellant indicated this was because he knew the calls were being recorded and that the prosecution could use what he said against him in court. He stated, "Look, I can't express myself because, you know what, they could use all that shit against me in – in court, you know?"; "they'll want to use these calls as –

---

**4**      On counts 2 and 3, the court imposed sentence as follows. As to count 2, the court imposed the upper term of four years, doubled to eight years due to the strike prior, plus five years for the great bodily injury enhancement, plus five years for the prior serious felony enhancement. As to count 3, the court imposed the upper term of five years, doubled to 10 years due to the strike prior, plus five years for the great bodily injury enhancement, plus one year for the deadly weapon enhancement, plus five years for the prior serious felony enhancement.

well, as – You know what I mean?"; and "I can't tell you how I feel about all that because I – I – they can use it…."

Also relevant to appellant's claims on appeal is that law enforcement gave him *Miranda* warnings before attempting to question him with regard to this incident. Appellant's statement was ultimately excluded because the trial court found he had invoked his right to an attorney early in the questioning.

Appellant moved in limine to exclude the recordings of the jail calls in their entirety "based on multiple grounds, including: hearsay, Evidence Code Section 352; Evidence Code 1054, et.seq.; lack of foundation improper character evidence (Evid. Code §1101(a)); and that it would violate the defendants right to confrontation," citing *Crawford v. Washington* (2004) 541 U.S. 36. In his written motion, appellant alleged generally that the statements were not admissible as adoptive admissions.

In open court, during a discussion on the jail calls, the court indicated its position that many of the statements made in the jail calls were admissible as adoptive admissions, in that appellant did not respond or responded in a remorseful manner to Natalie's statements. Defense counsel noted there were some instances in the calls where Natalie made statements to which appellant did not respond, and in some instances, responded by saying, "I can't talk about it or I can't say anything on the phone or I'm not going to talk about this." Defense counsel contended those instances could not be considered adoptive admissions as it "is more of a following of an advice of attorney, advice of myself as well as advice of other attorneys that have come into contact with [appellant], which is you are not to talk about your case over the phone since they are recorded."

The prosecutor asserted the proffered jail calls were admissible either as admissions by a party opponent under Evidence Code section 1220 or admissions that have been adopted under Evidence Code section 1221. The prosecutor further contended the jail calls were relevant because appellant talked about facts of the case as to why he

10.

did what he did and was relevant as consciousness of guilt because of appellant's attempts to dissuade Natalie from testifying.

The court ruled the jail calls were admissible, noting it was "not ruling on each specific item that's proffered by the People. But I think as a general proposition I have as I indicated on the record reviewed these, listened to them, read the transcripts. I think that the adoptive admissions are admissible as adoptive admissions with the appropriate instruction to the jury. It's for the jury to determine that question and the statements of the defendant that are evidence of dissuasion is admissible under the concept of consciousness of guilt." The court stated it had considered the issue raised by appellant's counsel, which it summarized as the "limitation of the People's use of an adoptive admission is if the admission by silence or adoption is under circumstances which indicate that the defendant is invoking a Fifth Amendment right not to speak. It's also limited if the defendant is acting upon the advice of counsel in remaining silent." The court stated those limitations did not apply because appellant clearly initiated the calls; thus, it was a voluntary act by him rather than a pretextual call or an action by the police or prosecution to trick appellant.

The calls were played for the jury as described *infra*.

**B.** *Appellant's Contentions*

On appeal, appellant makes several claims with regard to the portions of the calls which could be considered tacit adoptive admissions; that is, moments where Natalie made statements to which appellant did not directly respond. He asserts that none of the purported tacit adoptive admissions were admissible but draws our attention to two specific moments in the calls, that appellant contends were particularly damaging to his self-defense claim.

The first is the following exchange:

| | |
|---|---|
| "[APPELLANT]: | … But – but I'll forgive you, you know what I mean? And I hope you forgive me, too, you know? |
| "NATALIE []: | I didn't do anything to you, Julio. |
| "[APPELLANT]: | Huh? |
| "NATALIE []: | I didn't do nothing to you.  I was nothing… |
| "[APPELLANT]: | Well – well… |
| "NATALIE []: | …but good to you. |
| "[APPELLANT]: | …well, don't come over h- here and don't talk to – to the DA …." |

The second is:

| | |
|---|---|
| "NATALIE []: | … Like, how the f[***] you gonna put your life in danger with somebody who's giving you a – a place to lay your head at?  And then, like, I'm by myself, you know, like, with my kids.  And you know that my kids are the most important thing in my life and then you go and you… |
| "[APPELLANT]: | That's family. |
| "NATALIE []: | …go and that f[******] – that's crazy." |

Appellant also points to several moments in the calls where Natalie accused appellant of almost killing her or "going for the kill," and appellant does not directly respond.

### 1.     Evidence Code Section 1221

First, appellant argues the court erred under Evidence Code section 1221, which codifies the hearsay exception for adoptive admissions, providing that "[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his [or her] adoption or his [or her] belief in its truth."

12.

The California Supreme Court has explained that " '[i]f a person is accused of having committed a crime, under circumstances which fairly afford him [or her] an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he [or she] was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he [or she] fails to speak, or he [or she] makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt." (*People v. Cruz* (2008) 44 Cal.4th 636, 672, quoting *People v. Preston* (1973) 9 Cal.3d 308, 313–314.)

Appellant contends the purported tacit adoptive admissions within the call were not admissible because substantial evidence did not support the preliminary factual findings that appellant had a fair opportunity to deny Natalie's accusations and that he did not rely on his Fifth Amendment privilege against compelled self-incrimination in failing to respond. Appellant bases this contention on the statements he made throughout the calls that he could not fully express himself, defense counsel's representation that he advised appellant not to talk about the case over the phone because it was being recorded, and the fact that he had previously received *Miranda* warnings from law enforcement.

### 2.     Alleged Due Process Violations

In addition, appellant contends the admission of the purported tacit adoptive admissions violated his federal due process rights in two ways. First, he contends the rule of *Doyle*, *supra*, 426 U.S. 610 and its progeny applies to the present case.

In *Doyle*, the United States Supreme Court held a prosecutor may not seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest; using the defendant's postarrest silence in this matter violates due process. (*Doyle*, *supra*, 426 U.S. at p. 611.) In *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, the California Supreme Court held the *Doyle* rule also

13.

applied to the prosecutor's examination of an interrogating detective on the defendant's post-*Miranda* silence in their case-in-chief. (*Coffman and Marlow*, at p. 118.) Finally, in *People v. Eshelman* (1990) 225 Cal.App.3d 1513, the appellate court held that post-*Miranda* silence in the presence of a private citizen implicates *Doyle* "when the evidence demonstrates that [a] defendant's silence in [such a circumstance] results primarily from the conscious exercise of his constitutional rights." (*Eshelman*, at p. 1520 [*Doyle* error when prosecutor questioned the defendant on why he did not answer a witness's questions about why he killed her son, and the defendant answered it was, in part, because his attorney told him not to talk]; but see *People v. Medina* (1990) 51 Cal.3d 870, 889–891 [jury could draw adverse inference from the defendant's conversation in jail with his sister where the record did not suggest the defendant believed he was being monitored or intended his silence to invoke a constitutional right].)

Appellant contends under the circumstances of the present case—appellant being given *Miranda* warnings, knowing the calls were being recorded, and indicating he did not want to speak about certain topics, at a few points indicating this was because he did not want the prosecution to use his statements against him—the prosecution improperly used his purported tacit adoptive admissions in violation of his due process rights as articulated in *Doyle* and its progeny.

Alternatively, appellant contends that if we conclude the *Doyle* rule does not apply to the circumstances of the present case, his federal due process rights were nonetheless violated. Appellant contends this court should "hold that application of the adoptive admission rule under the circumstances here is unfair and a deprivation of due process for three reasons": (1) that "the premise underlying the tacit admission rule—that an innocent person will naturally deny all false accusations … —is irrational, and its application under the facts of this case was fundamentally unfair"; (2) "applying the tacit admission rule based on the facts of this case would unfairly punish [appellant] for adhering to the advice of his appointed counsel"; and (3) "the record establishes that a

reasonable person in [appellant's] position would have believed his silence was constitutionally protected."

**B.** *Analysis*

Assuming only for the purpose of appellant's arguments that any of his contentions have merit, we would not reverse because we conclude any error was clearly harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)[5]

We begin our harmlessness analysis by noting that appellant impliedly acknowledges that uncontested evidence at trial established his identity as the perpetrator. He does not contend the admission of the purported tacit adoptive admissions affected the jury's determination of his identity as the perpetrator. His claim is narrow, only that the purported tacit adoptive admissions—just a few of which he identifies specifically in his briefing—prejudiced him because, without their admission, one or more of the jurors may have credited his self-defense claim, acquitting him of all charges or resulting in a hung jury.[6]

While the jury rejected appellant's self-defense claim as a complete defense to the charges, they acquitted appellant of attempted murder and convicted him of the lesser

---

[5]     Respondent contends many of appellants arguments are forfeited because, as to the admissibility of the statements under Evidence Code section 1221, appellant did not, following the court's general ruling, object to any specific statements in the calls, and because he did not state his constitutional objections below precisely enough. Appellant disagrees but, in the event we find forfeiture, argues his counsel provided ineffective assistance for failing to properly object. We need not resolve the forfeiture or ineffective assistance of counsel issues given our conclusion all errors appellant raises with regard to the admission of purported tacit adoptive admissions are harmless beyond a reasonable doubt.

[6]     The jury was instructed on the right to self-defense with CALCRIM No. 3470. The jury was instructed the People had the burden to prove appellant did not act in self-defense and that appellant acted in self-defense if he (1) reasonably believed he or someone else was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully; (2) reasonably believed the immediate use of force was necessary to defend against that danger; and (3) used no more force than was reasonably necessary to defend against that danger. (CALCRIM No. 3470.)

included offense of attempted voluntary manslaughter, raising the inference that some or all of the members of the jury found appellant acted in *imperfect* self-defense. It is implausible, based on the totality of the evidence, that the purported tacit adoptive admissions had any effect on the decision of any members of the jury who relied on the imperfect self-defense theory to find appellant acted in imperfect rather than perfect self-defense.[7]

First, appellant overstates the damaging effect of the purported tacit adoptive admissions to his self-defense claim, as express admissions in the jail calls undermined the claim. While appellant did not directly respond to several of Natalie's statements regarding the incident (the purported tacit adoptive admissions), he did respond to some and made other express statements elucidating his self-defense claim.[8] On one occasion, Natalie asked appellant why he was afraid, and he stated it was because her brother was present and there were "people … outside." During the call *introduced by the defense*, appellant asserts he acted in "self-defense," and qualifies the statement by saying, "… you know what I mean? You have your brother there." Though defense counsel, in his closing argument, posited that Natalie attacked appellant with the knife, prompting him to act in self-defense, appellant himself, despite making several attempts throughout the

---

[7] The jury was instructed on two theories of attempted voluntary manslaughter: heat of passion and imperfect self-defense. (CALCRIM Nos. 603 & 604.) For any members of the jury who may have concluded appellant acted in the heat of passion, the exclusion of the statements would have had no effect on their decision to find him guilty of attempted voluntary manslaughter. To find appellant acted in the heat of passion, the jury members who relied on this theory would have had to find, among other things, that appellant was provoked in a manner that would have caused a person of average disposition to act rashly and without due deliberation. It is clear these jury members did not credit Natalie's statements indicating she did not do anything to appellant, which is the crux of the challenged purported adoptive admissions. We therefore focus the majority of our discussion on jurors who relied on the imperfect self-defense theory.

[8] Though appellant challenged the admission of the entirety of the jail calls below, on appeal, appellant raises no claim of error regarding the introduction of his express statements/admissions in the jail calls.

16.

calls to support his assertion he acted in "self-defense," notably never accused Natalie or even suggested she was the aggressor. His claim of "self-defense" was clearly based on a third party being present rather than defending an attack from Natalie.

For any members of the jury who relied on the imperfect self-defense theory, they would have had to find that appellant believed (1) he was in imminent danger of being killed or suffering great bodily injury and (2) the immediate use of deadly force was necessary to defend against the danger and (3) that one or both of those beliefs were unreasonable. Thus, the verdict clearly demonstrates the jury credited appellant's statements that he was in fear for his life and acted in what he perceived as self-defense, and there was no apparent reason they would not also credit his statements that the reason for his fear was that some third party was also present, or that appellant believed they were present. As the jury credited appellant's account of events, it would have been implausible for the jury to find appellant's use of force against Natalie was reasonable in light of appellant's fear stemming from a third party rather than from Natalie.[9]

Moreover, the evidence of perfect self-defense was, in contrast, weak. Appellant made numerous express statements reasonably interpreted as inculpatory throughout the calls, including his frequent pressure on Natalie not to cooperate with the prosecution, despite her many assurances she would not; statements of remorse; and statements indicating he deserved to be killed by Natalie's family for what he had done. These statements weigh against his perfect self-defense claim. Not even the call introduced by the defense was persuasive as reasonable doubt of appellant's guilt. Though Natalie told

---

[9] Even if we entertain the possibility that the jury did believe Natalie was the aggressor, the evidence appellant acted in perfect self-defense was still implausible. The evidence revealed that Natalie was four feet eight inches weighing 120 pounds and appellant was five feet eleven inches weighing 200 pounds. Appellant stabbed Natalie three times—at least once in a vital part of the body—and when considered against appellant's relatively minor cuts, the difference between their respective sizes, the neighbor's observation that Natalie was running from her apartment, and the alleged perpetrator emerged minutes later, the finding that appellant's use of force against Natalie was unreasonable was overwhelming.

appellant he was "not guilty," she further explained her statement by saying "that wasn't you," which, in context, appears more like an expression that appellant was not in his right mind or was not the type of person who would do what he did, not that he was not the perpetrator or acting in reasonable self-defense.[10] Though the transcript of the call indicates Natalie told appellant, "Okay then. Then that – that – that's – you defended yourself" and "Okay. You defended yourself," the recordings add more meaning than is indicated by the cold transcript of the call, as Natalie says these statements in an exasperated tone seemingly made to placate appellant after she had been arguing with him for nearly 10 minutes trying to convince him that she would not testify against him. Finally, Natalie's comment that she was drunk and did not remember if she did anything to make appellant mad or "trigger" him does not support an inference she attacked him with a knife, especially when viewed with the rest of the evidence. Rather, it suggests she did something to provoke appellant without knowing, supporting an inference that appellant acted unreasonably by using force.

In sum, the potential prejudicial effect of the purported tacit adoptive admissions was low in light of appellant's express statements related to his self-defense claim, the evidence supporting the jury's attempted voluntary manslaughter conviction was overwhelming, and the evidence supporting that appellant acted in perfect self-defense was weak. For the reasons stated, any error in admitting the purported tacit adoptive admissions from the jail calls was harmless beyond a reasonable doubt.

## II.     Denial of Appellant's Proposed Pinpoint Instruction

### A.     *Relevant Background*

The pattern instruction for adoptive admissions, CALCRIM No. 357, provides:

"If you conclude that someone made a statement outside of court that (accused the defendant of the crime/[or] tended to connect the defendant

---

[10]     Natalie's statement echoes a statement made by appellant in a prior call where he said in relation to the case, "Please, know that – that that person wasn't me."

18.

with the commission of the crime) and the defendant did not deny it, you must decide whether each of the following is true:

"1. The statement was made to the defendant or made in (his/her) presence;

"2. The defendant heard and understood the statement;

"3. The defendant would, under all circumstances, naturally have denied the statement if (he/she) thought it was not true;

"AND

"4. The defendant could have denied it but did not.

"If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true.

"If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose." (CALCRIM No. 357.)

Appellant requested the court instruct the jury with one of two proposed additions to the pattern instruction. First, appellant requested the following italicized portion be added to the penultimate paragraph as follows: "If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true, *unless you believe that defendant failure to respond was in reliance on his right of silence guaranteed by the Fifth Amendment of the United States Constitution.*" The second alternate appellant proposed was to replace the penultimate paragraph of the instruction with the following: "*You may consider Julio Torrez belief and reliance on his right of silence by the Fifth Amendment of the United States Constitution in deciding if under the circumstances he naturally couldn't explain or deny the accusation.*"

The court denied appellant's request, reasoning that appellant's counsel could argue he was relying on his right to remain silent based on the state of the evidence and that the court had already instructed the jury on appellant's Fifth Amendment right with regard to his testimony. The court further noted that it had addressed the legal issue

19.

regarding the interplay between the jail calls and the Fifth Amendment right prior to admitting the evidence and found appellant's Fifth Amendment privilege against self-incrimination had not been implicated.

The court instructed the jury with the unmodified text of CALCRIM No. 357.

**B.** *Analysis*

Appellant contends the court erred by denying appellant's request. We disagree.

A pinpoint instruction on a defense theory which relates to the reasonable doubt standard of proof to particular elements of the crime charged must be given at a defendant's request. (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 498; *People v. Bolden* (2002) 29 Cal.4th 515, 558; *People v. Johnson* (1992) 3 Cal.4th 1183, 1230.) The court may properly refuse a pinpoint instruction when it incorrectly states the law; is argumentative, such as when requested only to highlight particular evidence; duplicative of other instructions; potentially confusing; or not supported by substantial evidence. (*Mora and Rangel*, at p. 499; *People v. Moon* (2005) 37 Cal.4th 1, 30.) "[W]here standard instructions fully and adequately advise the jury upon a particular issue, a pinpoint instruction on that point is properly refused." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 857; see *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144 ["[T]he standard manslaughter instructions given adequately covered the valid points in the proposed pinpoint manslaughter instructions."].)

Appellant argues the proper standard of review of his claim is de novo, which applies when we are faced with the question of whether a jury instruction correctly states the law. Respondent, in contrast, urges us to apply the abuse of discretion standard. We agree with respondent that under the circumstances of the present case, the abuse of discretion standard is the proper standard. Our Supreme Court has recently applied an abuse of discretion standard in reviewing challenges to the denial of a pinpoint instruction when the instruction was duplicative. (*People v. Mora and Rangel*, *supra*, 5 Cal.5th at p. 497; cf. *People v. Brugman* (2021) 62 Cal.App.5th 608, 621, fn. 3

20.

[applying a de novo standard to the defendant's claim that a pinpoint instruction was improperly denied where the People did not argue for an abuse of discretion standard and because one of the issues is whether the proposed pinpoint instruction incorrectly stated the law].) Appellant does not claim the unmodified CALCRIM No. 357 instruction was an incorrect statement of law, nor that the reasonable doubt standard was implicated by the trial court's failure to make the proposed modification. Rather, he contends, the court should have granted his request for a modification as applied to his particular case simply because, as he asserts, it was a correct statement of the law and supported by substantial evidence.

We conclude the court did not abuse its discretion in declining to give the proposed instruction. The jury was fully and adequately advised on the issue of adoptive admissions with the unmodified CALCRIM instruction. Whether appellant was not answering certain statements made by Natalie because he knew the call was being recorded and did not want it to be used against him in a trial was one of the many factors the jury could have considered in determining whether the statements were adoptive admissions. As appellant points out in his briefing, a defendant might additionally remain silent "because of fear, anger, or pride." Thus, appellant's proposed instructions were argumentative in that they pointed out only one of the numerous factors the jury could have reasonably considered. As the trial court pointed out, the jury was instructed appellant had a right not to testify, and in that sense, the proposed instruction was also duplicative. (CALCRIM No. 355.) We cannot say that in ruling on appellant's request, the court acted "in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Williams* (2013) 58 Cal.4th 197, 270–271.) Thus, we find no error.

## III. Cumulative Error

Appellant contends that even if we find the alleged errors individually harmless, their cumulative effect were prejudicial so as to require reversal. He contends that if we

credited appellant's arguments, "the jury would have (a) received *some* inadmissible tacit admissions and (b) applied an incomplete instruction to the admissible tacit admissions" and the errors "altered the jury's assessment of the evidence and [appellant's] self-defense claim." Because we conclude the admission of any inadmissible tacit adoptive admissions was harmless beyond a reasonable doubt and the court did not err by declining to give appellant's pinpoint instruction, we reject appellant's cumulative error claim.

## IV. Resentencing in Light of Recent Legislation

Appellant contends the matter must be remanded for resentencing based on the recent enactment of Assembly Bill 518 and Senate Bill 567. We conclude remand for resentencing is appropriate.

### A. *Assembly Bill 518*

At the time of appellant's sentencing, former section 654, subdivision (a) required that a defendant who committed an act punishable by two or more provisions of law be punished under the provision that provided for the longest possible term. Assembly Bill 518 amended section 654, subdivision (a) to permit an act or omission punishable under two or more provisions of law to "be punished under either of such provisions." (Stats. 2021, ch. 441, § 1, eff. Jan. 1, 2022.) "[S]ection 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

The parties agree, as do we, appellant is entitled to the benefit of Assembly Bill 518. (See *People v. Sek* (2022) 74 Cal.App.5th 657, 673 ["Assembly Bill No. 518 … applies retroactively to defendants … whose convictions were not yet final when the law became effective January 1, 2022."].) They disagree, however, as to whether remand is appropriate. We contend it is.

22.

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, we have held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

We cannot say the record clearly indicates the trial court would have reached the same conclusion. Respondent contends it would have based on the fact it found no circumstances in mitigation and imposed the maximum sentence, relying on several circumstances in aggravation: "The defendant's prior convictions as an adult and sustained [petitions] in juvenile delinquency proceedings are numerous. The defendant has served prior California Youth Authority commitments and two State prison terms. The defendant committed violation of Penal Code Section 273.5 in the presence of a minor. The defendant was on felony probation and State parole when the crime was committed. The defendant's prior performance on probation and parole is unsatisfactory."

However, while the trial court did not impose the middle term, it did not have the opportunity to consider, and appellant had no opportunity to argue for, a stay of the 11-year base term in favor of the 8- or 10-year base term for the assault or domestic violence convictions, respectively, resulting in a slightly shorter aggregate sentence.

**B.** *Senate Bill 567[11]*

Effective January 1, 2022, Senate Bill 567 amended section 1170, restricting a trial court's sentencing discretion, including its ability to impose the upper term for a conviction. (Stats. 2021, ch. 731, § 1.3.) Pursuant to Senate Bill 567, section 1170 now precludes a trial court from imposing a sentence exceeding the middle term for any offense with a sentencing triad, unless "there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(1) & (2).) In other words, Senate Bill 567 provides for a presumptive middle term absent the presence of circumstances in aggravation, the facts underlying which have either been stipulated to by the defendant or proven beyond a reasonable doubt at trial. (§ 1170, subd. (b)(1) & (2); *People v. Lopez* (2022) 78 Cal.App.5th 459, 464.)

The parties agree, as do we, the amended version of section 1170, subdivision (b) applies retroactively in this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal. (See *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.)

While respondent argues remand is not necessary under Senate Bill 567, because we are already remanding for resentencing in light of Assembly Bill 518, we decline to address this issue, as it is moot. We rest assured the sentencing court will consider all

---

[11] On December 27, 2021, appellant filed a request for judicial notice of a record of legislative history for Senate Bill 567. On January 14, 2022, this court deferred ruling on appellant's request and granted respondent 15 days' leave to file a response, noting failure to file one may be deemed agreement appellant's request be granted. Respondent did not file a response. As respondent makes no objection and the record appears to be appropriate for judicial notice, we grant appellant's request.

sentencing provisions applicable at the time of resentencing, including section 1170 as amended by Senate Bill 567.[12]

## V.     Prior Serious Felony Enhancements

Appellant contends, and respondent agrees, that two of the three five-year section 667, subdivision (a) prior serious felony enhancements must be stricken under *Sasser*, *supra*, 61 Cal.4th 1.  We agree with the parties.

Our high court in *Sasser* held that determinate second-strike sentences were subject to section 1170.1, which draws a distinction between offense-based enhancements, which apply to every relevant count, and status-based enhancements, which apply only once.  (*Sasser*, *supra*, 61 Cal.4th at pp. 15, 17.)  Because the five-year prior serious felony enhancement is a status-based enhancement, it may only be added to the aggregate sentence rather than each individual count.  (*Id.* at p. 16.)  Therefore, upon remand for resentencing, the trial court may only impose one five-year prior serious felony enhancement.

## DISPOSITION

Appellant's convictions are affirmed.  The matter is remanded for resentencing in compliance with all applicable laws.  The trial court is instructed to impose the prior serious felony enhancement under section 667, subdivision (a) in compliance with *Sasser*.

DE SANTOS, J.

WE CONCUR:

MEEHAN, Acting P. J.

SNAUFFER, J.

---

[12]     We express no opinion on how the trial court should exercise any of its sentencing discretion upon remand.